UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------- x
JASON SORENSEN,                          :
                                         :
                    Plaintiff,           :      **MEMORANDUM &**
                                         :      **ORDER GRANTING**
        -against-                        :      **DEFENDANT'S MOTION**
                                         :      **FOR SUMMARY**
WALLINGFORD BOARD OF EDUCATION,          :      **JUDGMENT**
                                         :
                    Defendant.           :      3:21-CV-01680 (VDO)
-------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

Plaintiff Jason Sorensen brings this employment discrimination action against Defendant Wallingford Board of Education ("Defendant" or "Wallingford"). Plaintiff claims violations of the Americans with Disabilities Act ("the "ADA"") and the Connecticut Fair Employment Practices Act ("CFEPA") in the form of discrimination on the basis of his disability, failure to accommodate, and retaliation. Defendant moves for summary judgment on all claims.

For the reasons set forth below, the defendant's motion for summary judgment is **GRANTED**.

I.      **BACKGROUND**

        A.      **Factual Background**

The following facts are taken from Defendant's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Def.'s 56(a)," ECF No. 36), Plaintiff's Local Rule 56(a)2 Statement and Counter-Statement of Material Facts ("Pl.'s 56(a)," ECF No. 46-1), and the record. The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.

*Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.[1]

Plaintiff was hired by Wallingford Public Schools in August 2013 and was assigned to teach English at Sheehan High School. (Def.'s 56(a) ¶ 1.) He is a member of the Connecticut Education Association teachers' union. (*Id.* ¶ 3; Pl. Opp., ECF No. 46, at 2.) In July 2019, Plaintiff was diagnosed with acute myeloid leukemia ("AML"). (Def.'s 56(a) ¶ 8.) He notified Danielle Bellizzi, then Assistant Superintendent of Personnel, of his condition on July 23, 2019, explaining that he had been diagnosed with AML, that he needed a stem cell transplant, and that he would not be able to teach during the 2019–20 school year. (*Id.* ¶ 9.) Plaintiff underwent a stem cell transplant on October 26, 2019. (*Id.* ¶ 8.)

### 1.    2019-20 School Year

Plaintiff's request for a leave of absence for the 2019–20 school year was granted. (Def. Ex. A, ECF No. 36-1, at 102:2–8.) Plaintiff applied for and received FMLA leave from August 22, 2019 through November 18, 2019, and was paid 25 sick days through September 25, 2019. (Def.'s 56(a) ¶ 12; Def. Ex. A at 102; Def. Ex. D, ECF. No. 36-4, at 2.) He received a monthly

---

[1] Where the parties "identify disputed facts but with semantic objections only or by asserting irrelevant facts . . . which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact." *New Jersey v. N.Y.C. Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y. Mar. 15, 2021); *see also Scanlon v. Town of Greenwich*, 605 F. Supp. 3d 344, 351 (D. Conn. 2022) (finding that plaintiff's 56(a)2 Statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (deeming admitted Rule 56(a)1 Statements where plaintiff responded with conclusory allegations, speculation, conjecture or legal arguments).

Where possible, the Court has relied on the undisputed facts in the parties' 56(a) submissions. However, direct citations to the record have also been used where relevant facts were not included in any of the parties' statements of material facts, or where the parties did not accurately characterize the record.

disability check for two to three months pursuant to the union contract. (Def.'s 56(a) ¶ 13.) On September 16, 2019, Plaintiff was approved for disability benefits from the Teachers Retirement Board ("TRB"), effective October 1, 2019, and beginning on or about February 24, 2020, Plaintiff received 30 days of paid sick time, the maximum amount, which was donated pursuant to a sick bank provision in the newly negotiated teachers' contract. (*Id.* ¶¶ 14, 15; Def. Ex. D at 2; Def. Ex. E, ECF No. 36-5.) Plaintiff concedes that all his requests were approved. (Def. Ex. A at 102.)

## 2.    2020–21 School Year

Plaintiff contacted Defendant to advise that he wanted to return to teaching for the 2020–21 school year. (Def. Ex. B, ECF No. 36-2, at 17:14–20.) He had first notified Defendant of his intent to teach during the 2020-21 school year in October 2019. (Pl. Ex. 2, ECF No. 46-3.) On May 22, 2020, Plaintiff received a memo from Bellizzi, which stated, in part:

> [A]ccording to TRB, districts are not required to hold a position for a teacher who is receiving the TRB disability benefit and may consider such teacher to be retired. Further, teachers receiving the TRB disability benefit may not return to active teaching in any district unless they receive approval from the Medical Review Committee. . . . [A]s a courtesy to you, we are willing to permit your return to work in Wallingford for the 2020–21 school year, if the Medical Review Committee approves you to return to active teaching for 2020–21 and it is determined that you are able to fulfill the essential functions of your position. . . .
>
> As a district we are currently in the process of planning for the 2020–21 school year. This requires us to review staffing at all levels and teacher assignments. After reviewing the student and staff needs with Mark T. Sheehan, the English Department is reducing their staffing needs by 1.4 FTE, which means the 1.0 English position that you previously held will be reduced to a .6 teaching position. This also means that, if you obtain clearance to return to work, you would become part of the district Reduction in Force ["RIF"] process. This year, our district Reduction in Force process will take place on or about Thursday, June 11th. Although your meeting with the Medical Review Committee is not occurring until July, we will permit you to participate in this process at the same time as all other teachers. This is a courtesy we are granting you, due to your

unique circumstances, but we reiterate that your return to any position is contingent upon your being cleared to return to active teaching duties and able to fulfill the essential functions of your position[.]

(Def.'s 56(a) ¶ 17; Def. Ex. F, ECF No. 36-6, at 1–2.)

### a.    The RIF Process

Wallingford's staffing needs are evaluated every year for budget purposes and are determined based on student enrollment, courses being offered, the number of students who have required certain courses, and class size. (Def.'s 56(a) ¶ 18.) Plaintiff admits that being part of the RIF process did not violate the union contract and that other teachers, whose disability status was unknown to Plaintiff, were also involved in the RIF process at that time. (*Id.* ¶¶ 19, 20; Def. Ex. A at 36, 37.)

Pursuant to Section 6.2 of the union contract, "If a position is eliminated, the staff person that is displaced in the teaching area being reduced shall be the one with the least system wide seniority." (Def.'s 56(a) ¶ 21; Def. Ex. C, ECF No. 36-3, at § 6.2.) The contract also reads, "Displaced teachers shall have first choice, in accordance with their system wide seniority, of all vacant positions for which they are certified. Such teachers shall have priority over all other transfer requests." (Def.'s 56(a) ¶ 22; Def. Ex. C at § 6.3.) The RIF process is further explained as follows:

If there are not any open positions available within the displaced teacher's certification, then he/she would displace the least senior person within the certification of the initially displaced teacher. . . .

If a teacher holds a teaching certificate such as Social Studies grades 7–12, he/she is also certified to teach any general area such as Capstone for which there is no specific certification other than being certified at the grade level in which the course is taught.

(Def.'s 56(a) ¶ 23; Def. Ex. G, ECF No. 36-7, at 1.)

Plaintiff was not aware of there being an open English position available for which he was certified when his position was eliminated. (Def.'s 56(a) ¶ 24; Def. Ex. A at 39:3–16.) On June 4, 2020, Plaintiff emailed Dr. Salvatore Menzo, Superintendent of Schools, asserting that he had been treated less favorably because of his disability because he was not offered a full-time English position, and that he wanted clarification regarding the RIF process. (Pl. Ex. 8, ECF No. 46-9, at 1.) In his response, Dr. Menzo explained that the "determination of which teachers are displaced due to a reduction in force is a process established through collective bargaining," that both the district and union were in agreement with regards to the implementation of the RIF process, and that it was his understanding Plaintiff was going to be offered a full-time English position during the RIF process the next day. (Def. Ex. H, ECF No. 36-8, at 1–2.) Indeed, pursuant to the RIF process, Plaintiff was offered a full-time 7th grade English position on June 11, 2020, which he accepted. (Def.'s 56(a) ¶ 25.) Dr. Menzo later followed up with Plaintiff to confirm that an investigation into his discrimination claim was conducted and that no evidence of discrimination was found, as the decision to eliminate the 1.0 FTE English position was due to "budgetary cuts and district needs." (Def. Ex. H at 1.)

### b.   Plaintiff's Return to Work

On July 7, 2020, Plaintiff obtained clearance from the TRB to return to full-time active teaching duty. (Def.'s 56(a) ¶ 29; Def. Ex. I, ECF No. 36-9.) In support thereof, Plaintiff submitted a May 15, 2020 report from his physician to both the TRB and Defendant, which stated, "Recovering well. Expected to be able to return to return to work without restrictions for the 2020–2021 school year." (Def.'s 56(a) ¶ 30; Def. Ex. J, ECF No. 36-10, at 2.) On July 14, 2020, Defendant sent out a survey to all employees, including Plaintiff, who had indicated

on a prior survey that they would be unable to come to work when school opens in light of the COVID-19 pandemic. (Def.'s 56(a) ¶¶ 31, 33; Def. Ex. K, ECF No. 36-11, at 1.) Plaintiff responded to the July 14 survey, stating:

> At this time and to my knowledge, no public health authority has directed me not to return to work. However, it is possible that because I am high risk (per my disability arising from treatment for leukemia and stem cell transplant, as previously discussed and documented) that I will require reasonable accommodations considering the potential serious health implications of the current pandemic.

(Def.'s 56(a) ¶ 34; Def. Ex. L, ECF No. 36-12, at 3.)

In early August 2020, following the announcement that another high school English teacher was leaving the district, Plaintiff was offered the opportunity to transfer back to Sheehan High School, which he accepted. (Def.'s 56(a) ¶ 35; Def. Ex. A at 59:12–19.)

### c.    Plaintiff's Reasonable Accommodation Requests

Following the completion of the July 14 survey, Plaintiff emailed Bellizzi on August 19, 2020 to set up a meeting to discuss "accommodations needed for [his] return to work," later explaining that his physical disability placed him at a very high risk with respect to COVID-19 and requesting to remotely attend the upcoming Professional Development ("PD") days. (Def.'s 56(a) ¶ 36; Def. Ex. M, ECF No. 36-13, at 2, 3.) Bellizzi replied:

> After reviewing your file, I noticed that the last documentation you sent to us included medical documentation from your physician dated 5/15/20 indicating that you are "Expected to return to work without restrictions for the 2020-2021 school year." Please provide updated medical documentation that states it is necessary for you to complete the professional development virtually from home.

(Def.'s 56(a) ¶ 37; Def. Ex. M at 1.) Plaintiff submitted an updated medical note dated August 19, 2020 in response to Bellizzi's email, which "request[ed] off-site remote teaching as a reasonable accommodation for the 2020-2021 school year." (Def.'s 56(a) ¶ 39; Def. Ex. N,

ECF No. 36-14.) Bellizzi then suggested that they meet the following Monday to discuss Plaintiff's request and agreed to have Plaintiff attend Monday's PD day virtually. (Def. Ex. M at 1.) On August 24, 2020, Plaintiff met virtually with Bellizzi and his union representative and discussed Plaintiff's request to attend the rest of the PD days remotely, which was granted. (Def.'s 56(a) ¶ 42; Def. Ex. A at 73:24–74:2; Def. Ex. B at 35:15–17.) Plaintiff was not required to attend any of the eight PD days in person. (Def.'s 56(a) ¶ 43.)

When students returned to school on September 3, 2020, the schools were operating on a hybrid model with student instruction being provided in-person in the morning and virtually in the afternoon. (*Id.* ¶¶ 47–48; Def. Ex. O, ECF No. 36-15.) As part of its re-opening plan, Wallingford did not have a full-time remote learning position; all full-time teachers were teaching a half day in person in the morning. (Def.'s 56(a) ¶ 45.) However, Plaintiff and Defendant reached an agreement prior to the start of the school year whereby Plaintiff would not be required to teach the in-person students in the morning and would only teach the voluntary distance learning ("VDL") students in the afternoon. (*Id.* ¶ 49; Def. Ex. A at 82:23–83:14.) Plaintiff used sick time and/or paid sick leave under the Emergency Paid Sick Leave Act ("EPSLA") to cover the mornings when he was not teaching. (Def.'s 56(a) ¶ 49; Def. Ex. A at 84:21–85:8, 86:10–20.)

Shortly into the school year, Plaintiff's accommodation was amended to allow Plaintiff one morning per week to collaborate with the in-person teacher for which Plaintiff was not required to use sick time. (Def.'s 56(a) ¶ 50.) Later in the school year, the school went to a full remote schedule due to a rise in COVID-19 cases and then back to a hybrid model, whereby the in-person and virtual students were taught simultaneously. (*Id.* ¶¶ 54, 55.) Given the schedule changes and Plaintiff's receipt of 10 EPSLA days, Plaintiff was only required to

utilize 12 ½ days of sick time for the entire school year. (*Id.* ¶ 57; Def. Ex. S, ECF No. 36-19.) At all times, Plaintiff maintained his benefits, the same benefits any full-time WPS employee would receive. (Def.'s 56(a) ¶ 51; Def. Ex. A at 84:7–20.)

At the end of the 2020-21 school year, Sheehan High School provided a grab-and-go lunch for its staff members as a token of appreciation. (Def.'s 56(a) ¶ 61.) Plaintiff claims that he was "excluded" from this event, but admits that he received an email communication about the event. (Def. Ex. A at 95:20–24; 97:7–12.) Additionally, the school held a final outdoor in-person faculty meeting "as a kind of a good-bye." (Def.'s 56(a) ¶ 62; Def. Ex. P, ECF No. 36-16, at 5:16–18.) The meeting was scheduled the day prior and there were no provisions made for people to participate remotely. (Def.'s 56(a) ¶ 62; Compl., ECF No. 1, at ¶ 51.) All other faculty meetings during the school year were conducted remotely. (Def. Ex. P at 5:11–12; Pl. Ex. 7, ECF No. 46-8 ¶ 28.)

### 3.   2021–22 School Year

In March 2021, following an announced retirement, Plaintiff requested a transfer to Lyman Hall High School for the 2021–22 school year, which was granted in June 2021. (Def.'s 56(a) ¶ 58.) Plaintiff also emailed Jim Genova, the English department head for both Sheehan and Lyman Hall, a list of preferred courses for the following school year in March 2021. (*Id.* ¶ 59.) On June 9, 2021, Plaintiff was provided his class list and saw that he was not assigned any of the classes he requested. (*Id.*). Defendant contends that Lyman Hall created the class schedule prior to learning that Plaintiff was transferring to the school. (Def. Ex. Q, ECF No. 36-17, at 3:2–4:9.)

Plaintiff claims that on or about November 1, 2021, he made a written request that he be permitted to participate remotely in an upcoming Personal Development day, but his request

was denied. (Compl. ¶¶ 56, 57.)[2] Plaintiff was not required to attend the Personal Development day in person. (Def. Ex. A at 100:19–21.)

### B.   Procedural History

On October 6, 2020, Plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission, alleging that Defendant had discriminated against him due to his disability, failed to provide him with reasonable accommodations, and retaliated against him for his exercise of his rights. (Pl. Opp. at 9–10, Pl. Ex. 13, ECF No. 46-14, at 3, 11.) Defendant became aware of Plaintiff's complaint on or around November 16, 2020. (Pl. Ex. 13 at 3.)

Plaintiff filed the instant action on December 17, 2021, bringing claims under the ADA and CFEPA against Defendant. Wallingford filed its Answer on February 10, 2022. (Answer, ECF No. 16.) Defendant moved for summary judgment as to all claims on October 4, 2023. (Def. Mot., ECF No. 35.) Plaintiff opposed the motion on January 5, 2024, and Defendant filed its reply on February 12, 2024. (ECF Nos. 46, 52.)

## II.   <u>LEGAL STANDARD</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[3] A fact is material when it "might

---

[2] Because Plaintiff does not mention this allegation in his opposition to Defendant's motion for summary judgment or Local Rule 56(a)2 Statement, the Court finds it to be abandoned. *Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95-CV-5399 (JSR), 1998 WL 651076, at *3 (S.D.N.Y. Sept. 23, 1998).

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for it. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

Courts construe discrimination and retaliation claims brought under CFEPA similarly to such claims brought under the ADA. *See Hopkins v. New Eng. Health Care Emps. Welfare*

*Fund*, 985 F. Supp. 2d 240, 255 (D. Conn. 2013) (discrimination and retaliation claims brought under CFEPA and the ADA are analyzed in the same way); *Beason v. United Techs. Corp.*, 337 F.3d 271, 277–78 (2d Cir. 2003) (noting that CFEPA's definition of disability is broader than the definition under the ADA); *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 205–06 (D. Conn. 2013). Thus, the Court will treat Plaintiff's CFEPA and ADA claims as the same in resolving the summary judgment motion.

## III.   DISCUSSION

Plaintiff asserts claims for disability discrimination, failure to provide reasonable accommodations, and retaliation. For the following reasons, Plaintiff's claims are dismissed.

### A.   Plaintiff's Disability Discrimination Claims (Counts One and Four)

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). "Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination." *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he

suffered an adverse employment action because of his disability. *See Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

"Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). "At that point, the burden of production shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Smith*, 440 F. Supp. 3d at 328 (quoting *Vega*, 801 F.3d at 83); *see also Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016).

"If the employer carries that burden, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Walsh*, 828 F.3d at 75. "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *accord Smith*, 440 F. Supp. 3d at 328.

Defendant argues that it is entitled to summary judgment on the discrimination claims because Plaintiff did not suffer an adverse employment action. The Court agrees.

Plaintiff raises at least six factual theories of how Wallingford discriminated against him: (1) in May 2020, he was told that he could not return to his previous high school teaching assignment and "was forced to choose a 0.6 part-time position teaching English at the high school level or a full time position teaching Coding in a WPS middle school, or participat[e] in the Reduction in Force process set out in the WPS contract" (Pl. Opp. at 14); (2) in August

2020, he was not immediately granted his request to attend eight PD days remotely; (3) Plaintiff was required to use leave time and/or sick days for half of the days during which he taught the other half of the days remotely to remain a full-time employee; (4) Plaintiff was designated the "co-teacher" in PowerSchool while his in-person counterpart, Marika Sagnella, was designated as the "lead teacher"; (5) he was not assigned any of the classes he requested for the 2021–22 school year; and (6) Plaintiff was not able to attend remotely two events at the end of the 2021–22 school year. Construing the record in the light most favorable to Plaintiff and drawing reasonable inferences in his favor, none of theories constitutes an adverse employment action for purposes of a discrimination claim.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004); *accord Reynolds v. HNS Mgmt. Co.*, No. 3:20-CV-00471-MPS, 2023 WL 2526532, at \*7 (D. Conn. Mar. 15, 2023).

As a preliminary matter, Plaintiff's first theory of how he suffered an adverse employment action is rendered moot by the fact that he was assigned to teach 7th grade English full time as part of the RIF process in June 2020, and ultimately returned to the high school as a full-time English teacher—*i.e.*, his previous assignment—prior to the start of the school year. *See Guglietta v. Meredith Corp.*, 301 F. Supp. 2d 209, 215 (D. Conn. 2004) ("Plaintiff did not

suffer an adverse employment action . . . due to the continuation of identical job responsibilities"). Moreover, the fact that Plaintiff participated in the RIF process does not constitute an adverse employment action, as (1) it was a courtesy extended to Plaintiff even though he was not yet medically cleared to return to work; (2) Plaintiff consented to participating in the process; and (3) he acknowledged that being part of the RIF process did not violate the union contract and that other teachers, whose disability status was unknown to Plaintiff, were also involved in the RIF process at that time. *See, e.g.*, *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (affirming district court's holding that there was no adverse action where Plaintiff consented to postponing his tenure review); *Grasso v. EMA Design Automation, Inc.*, 618 F. App'x 36, 37 (2d Cir. 2015) (company-wide reduction in force not discriminatory adverse employment action).

Defendant's failure to quickly or immediately grant Plaintiff's request to attend the Professional Development days remotely also was not an adverse employment action, nor was the requirement for Plaintiff to use leave time and/or sick days for the half days he was not working, as neither materially altered the terms or conditions of his employment. *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 512 (E.D.N.Y. 2019) ("the short delay in receiving [Plaintiff's] other requests is not enough to constitute adverse employment action, particularly since the accommodations were granted before the school year began and before [h]e returned to work"); *Horsey v. ADT LLC*, No. 5:17-CV-1356 (GTS/ML), 2020 WL 554390, at *13 (N.D.N.Y. Feb. 4, 2020) ("Paid leave time is provided to enable employees to have time off on days they would otherwise be required to work based on their schedule; the Court cannot see how requiring Plaintiff to use h[is] paid leave time in just such a way was materially adverse to Plaintiff, particularly because there is no admissible record evidence to show that

[he] lost appreciable pay or other benefits as a result of using h[is] leave time[.]"). Similarly, Plaintiff did not suffer an adverse employment action when he was designated as "co-teacher" instead of "lead teacher" within the computer system, which was described by Plaintiff's counsel as a "slight." (Pl. Opp. at 16.) *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("The unspecified inconvenience that appellant endured because of the relatively minor administrative miscues that occurred during the reassignment process is not cognizable as an adverse employment action."); *Miksic v. TD Ameritrade Holding Corp.*, No. 12-CV-4446 (AJN), 2013 WL 1803956, at *3 (S.D.N.Y. Mar. 7, 2013) ("Actions that cause a plaintiff embarrassment or anxiety are insufficient to qualify as an adverse action because such intangible consequences are not materially adverse alterations of employment conditions."). Even if Plaintiff was reprimanded, as opposed to slighted, such a claim cannot constitute an adverse employment action where, like here, there are no objective indicia of material disadvantage to Plaintiff. *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (finding the record would not permit a reasonable jury to find that a reprimand sufficiently affected the terms and conditions of a plaintiff's employment to constitute an adverse employment action).

The Court further concludes that Defendant's failure to assign Plaintiff the classes he wished to teach for the 2021–22 school year and to provide accommodations for Plaintiff to attend two events at the end of the 2021–22 school year do not constitute adverse employment actions, again because these actions, based on the evidence presented, were not "materially adverse with respect to the terms and conditions of employment." *See Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 34 (2d Cir. 2010) ("[Plaintiff] presented no evidence[ ] to demonstrate that his absence from either of the two meetings resulted in a materially adverse change in the terms and conditions of [his] employment. . . . Nor does the record contain any

evidence that, by his missing the [] meeting[s], [Plaintiff]'s terms and conditions of employment changed in any material manner."); *Gallagher v. Town of Fairfield*, No. 3:10–CV–1270 (CFD), 2011 WL 3563160, at *5 (D. Conn. Aug. 15, 2011) ("[A] failure to accommodate, by itself, is not sufficient for purposes of establishing an adverse employment action."); *Batyreva v. N.Y.C. Dep't of Educ.*, No. 07-CV-4544, 2010 WL 3860401, at *12 (S.D.N.Y. Oct. 1, 2010) ("[Plaintiff]'s purportedly unfavorable teaching schedule for the Fall 2006 semester is not an adverse employment action . . . [T]his new schedule did not significantly diminish [his] material responsibilities . . . or otherwise ha[ve] such a substantial impact on h[is] job as to be considered tantamount to a demotion."), *aff'd*, 464 F. App'x 31 (2d Cir. 2012). Finally, Plaintiffs concedes that he maintained all his benefits at all times (Def.'s 56(a) ¶ 51), and at no point does Plaintiff allege or provide evidence that he was demoted, terminated, or constructively discharged.

Accordingly, because Plaintiff did not suffer any adverse employment action, Defendant's summary judgment motion as to the discrimination claims is granted.

### B.      Plaintiff's Failure to Accommodate Claim (Count Two)

Plaintiff alleges that defendant failed to grant, or was delayed in granting, him reasonable accommodations when he (1) "sought to be permitted to teach remotely full time or to perform some combination of remote classroom work and other, necessary teaching work," and (2) "requested that he be permitted to remotely attend the eight Professional Development (PD) days[.]" (Pl. Opp. at 19–20.) For the reasons that follow, Defendant's motion for summary judgment is granted with respect to this claim under the ADA.

The ADA defines discrimination to include a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability . . . a plaintiff must demonstrate that (1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of [plaintiff's] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019).[4]

A reasonable accommodation "enable[s] an individual with a disability who is qualified to perform the essential functions of [his] position . . . [or] to enjoy equal benefits and privileges of employment as [they] are enjoyed by [the employer's] other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). But it need not "perfect[ly] eliminat[e] [ ] all disadvantage that may flow from the disability" or "lower [ ] standards." *Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) (analyzing the Rehabilitation Act).[5] Where the "employer has already taken . . . measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). An employee has no right under the ADA to the accommodation of his choice, so

---

[4] The parties do not seem to dispute that Plaintiff had a disability or that Defendant had notice of Plaintiff's disability.

[5] "Reasonable accommodation" has the same meaning under the Rehabilitation Act and the ADA. *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995).

long as the accommodation he receives is reasonable. *Fink*, 53 F.3d at 567; *see also Cormier v. City of Meriden*, 420 F. Supp. 2d 11, 21 (D. Conn. 2006) ("[T]he ADA does not necessarily entitle plaintiff to h[is] preferred accommodation so long as the offered one does not create a significant burden on h[im].").

"A delay in providing a reasonable accommodation can also violate the ADA, if that delay is caused by discriminatory animus and is sufficiently lengthy to constitute a constructive denial of a reasonable accommodation." *Wenc v. New London Bd. of Educ.*, No. 3:14-CV-0840 (VAB), 2016 WL 4410061, at *12 (D. Conn. Aug. 16, 2016), *aff'd*, 702 F. App'x 27 (2d Cir. 2017); *see also Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015) (noting that courts in the Second Circuit have held that delay in providing an accommodation can sustain an ADA claim if the plaintiff can show that "the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence").

Here, the record demonstrates that Wallingford provided a number of plainly reasonable accommodations to satisfy Plaintiff's two requests for the 2020–21 school year with little, if any, delay.

### 1.    Reasonableness of Accommodations

Plaintiff emailed Bellizzi on August 19, 2020 to set up a meeting to discuss "accommodations needed for [his] return to work," later explaining that his physical disability placed him at a very high risk with respect to COVID-19 and requesting to remotely attend the upcoming PD days. (Def.'s 56(a) ¶ 36; Def. Ex. M at 2, 3.) Bellizzi replied the next day, asking Plaintiff to "provide updated medical documentation that states it is necessary for [him] to complete the professional development virtually from home." (Def.'s 56(a) ¶ 37; Def. Ex. M at 1.) Plaintiff promptly submitted an updated medical note dated August 19, 2020 in response

to Bellizzi's email, which "request[ed] off-site remote teaching as a reasonable accommodation for the 2020-2021 school year." (Def.'s 56(a) ¶ 39; Def. Ex. N.) The same day, Bellizzi suggested that they meet the following Monday, four days later, to discuss Plaintiff's request and agreed to have Plaintiff attend Monday's PD day virtually. (Def. Ex. M at 1.)

On August 24, 2020, Plaintiff met virtually with Bellizzi and his union representative and discussed Plaintiff's request to attend the rest of the PD days remotely, which was granted. (Def.'s 56(a) ¶ 42; Def. Ex. A at 73:24–74:2; Def. Ex. B at 35:15–17.) Plaintiff was not required to attend any of the eight PD days in person. (Def.'s 56(a) ¶ 43.) Therefore, the time elapsed between Plaintiff's initial request to attend the PD days remotely and Defendant's granting of that request was only five days.

As for Plaintiff's request to work remotely for the entire 2020–21 school year, Plaintiff and Defendant reached an agreement prior to the start of the school year whereby Plaintiff would not be required to teach the in-person students in the morning and would only teach the voluntary distance learning ("VDL") students in the afternoon. (*Id.* ¶ 49; Def. Ex. A at 82:23–83:14.) Defendant agreed to allow Plaintiff to use sick time and/or paid sick leave under EPSLA to cover the mornings when he was not teaching in order to maintain his full-time employee status. (Def.'s 56(a) ¶ 49; Def. Ex. A at 84:21–85:8, 86:10–20; Def. Ex. B at 54:8–23.) Considering the school year started on September 3, 2020 (Def. Ex. O), only a few weeks elapsed between Plaintiff's request to teach remotely and maintain his full-time status, and Defendant's accommodation of said request.

As this summary demonstrates, when Plaintiff voiced his accommodation requests due to his disability and with supporting medical documentation, he received such

accommodations merely days after. Consequently, the Court cannot conclude that the delay was "sufficiently lengthy to constitute a constructive denial of a reasonable accommodation." *Wenc*, 2016 WL 4410061, at *12. What is more, the granted accommodations were reasonable and a reasonable juror could not conclude otherwise. *See Thomas v. Bridgeport Bd. of Educ.*, No. 3:20-CV-1487 (VLB), 2022 WL 3646175, at *4 (D. Conn. Aug. 24, 2022) (recognizing that allowing Plaintiff to use both sick leave and donated leave even though she was not ill was a reasonable accommodation); *Bielski v. Green*, 674 F. Supp. 2d 414, 425–26 (W.D.N.Y. 2009) (observing that because defendant's accommodation was "consistent with" the advice of plaintiff's physician, summary judgment on plaintiff's reasonable accommodation claim was appropriate); *Naderi v. Sophos Inc.*, No. 15-CV-04006 (JCS), 2016 WL 4398287, at *17 (N.D. Cal. Aug. 18, 2016) (holding that by allowing Plaintiff to attend meetings remotely, "[Defendant] therefore provided [Plaintiff] with reasonable accommodations that directly addressed his inability to be physically present during company meetings and conversations.").

From July 2019, when Plaintiff first raised concerns about his disability to Wallingford, through the date this lawsuit was filed in December 2021, Plaintiff received a number of plainly reasonable accommodations for his disability on a continuous basis. As a result, the failure to grant Plaintiff's request to attend all eight PD days remotely immediately does not mean that Defendant failed to reasonably accommodate a disability. *See Wildman v. Verizon Corp.*, No. 1:05-CV-899 (FJS/DRH), 2009 WL 104196, at *2 n.3 (N.D.N.Y. Jan. 14, 2009) ("Where an employee provides an interim reasonable accommodation, its delay in providing accommodation is not a failure to accommodate.") (citing *Ungerleider v. Fleet Morg. Grp. Of Fleet Bank*, 329 F. Supp. 2d 343, 354–55 (D. Conn. 2004)); *see also Trepka v. Bd. of Educ.*, 28 F. App'x 455, 460 (6th Cir. 2002) (affirming district court's grant of summary judgment

where a school board provided alternative accommodations, rather than the specific accommodation plaintiff requested, and plaintiff offered no evidence regarding the "adequacy" of the alternatives).

Where an employer has taken measures to accommodate the plaintiff's disability, as is the case here, the employer is entitled to summary judgment if the undisputed facts show that the accommodations were "plainly reasonable." *Noll*, 787 F.3d at 94, 98. The employer has no legal obligation to explore the plaintiff's suggested accommodation so long as the accommodation it actually provided is reasonable. *Id.* As explained above, a reasonable juror could not conclude from this record that the accommodations that Wallingford provided were unreasonable. Thus, summary judgment is appropriate on Plaintiff's claim because Wallingford provided him the reasonable accommodations required under the ADA.

### 2. Engagement in Interactive Process

To the extent that Plaintiff argues that Defendant's delay in engaging in the "interactive process" alone constitutes a violation of the ADA (*see* Pl. Opp. at 21), the Court disagrees. Once an employee raises a disability, the ADA contemplates that the employee and employer may need to engage in an interactive process to determine an appropriate accommodation. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("We have held that the ADA contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated.") If, however, an employer is providing a reasonable accommodation, the failure to engage in an interactive process with its employee alone cannot violate the ADA. *See Noll*, 787 F.3d at 98 (holding that, because defendant provided a reasonable accommodation to plaintiff, "any failure to engage in an interactive process—even if supported

by the record—did not give rise to a discrimination claim [under the ADA]"). Therefore, the fact that Wallingford did not meet with Plaintiff until after he requested a meeting did not violate the ADA here because reasonable accommodations were provided.

Accordingly, the Court grants summary judgment on Plaintiff's reasonable accommodation claim under the ADA.

### C. Plaintiff's Retaliation Claims (Counts Three and Five)

Plaintiff contends that Defendant retaliated against him for complaining "to Superintendent Menzo in June 2020 that Bellizzi had engaged in disability discrimination . . . and after he filed claims of disability discrimination" with the CHRO and EEOC in November 2020. (Pl. Opp. at 24.) Defendant argues that Plaintiff did not suffer an adverse employment action and there was no causal connection between the protected activity and any adverse employment action. (Def. Mem. at 28.) Because the Court agrees that Defendant did not suffer an adverse employment action, it grants summary judgment on his retaliation claims.

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) participation in a protected activity known to Defendant; (2) an employment action that disadvantaged him; and (3) a causal connection between the protected activity and the adverse employment action. *Richardson v. Comm'n on Human Rts. & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008). Once a plaintiff establishes the *prima facie* case, the burden shifts to a defendant to proffer a "legitimate, nonretaliatory reason for the challenged employment decision," whereupon the burden shifts back to Plaintiff to demonstrate that Defendant's rationale is "merely a pretext for [the] impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

The adverse action standard for Title VII retaliation is slightly different from that of discrimination. The Supreme Court in *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S.

53 (2006) expanded the definition of an adverse action for Title VII retaliation claims to include changes in employment outside the terms and conditions of employment. *See id.* at 64. The Supreme Court held that an adverse action in the retaliation context means "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. The Court must thus consider alleged adverse actions that would not necessarily be cognizable under a discrimination claim.

As a preliminary matter, Plaintiff does not specify what retaliatory actions Defendant took in response to his protected activity; thus, the Court presumes that the six alleged adverse actions discussed in Section III.A, *supra*, which include the reasonable accommodations Wallingford provided Plaintiff upon his request, are the retaliatory actions subject to this claim. However, these actions do not constitute adverse employment actions because they did not disadvantage Plaintiff in a materially significant way, nor could they be found to dissuade a reasonable employee from complaining of discrimination. *See, e.g.*, *Burlington N.*, 548 U.S. at 68 ("The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. . . . It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."); *Kaganovich v. McDonough*, 547 F. Supp. 3d 248, 273 (E.D.N.Y. 2021) ("[Plaintiff] fails to establish that this two-day delay in approval of his leave requests caused material adversity sufficient to dissuade a reasonable employee from complaining of discrimination.").

In fact, as the Court discussed above, Defendant accommodated Plaintiff's disability in a reasonable way and granted his other requests, even after Plaintiff complained of

discrimination in both June 2020 and November 2020.[6] As a result, no reasonable jury could conclude that Plaintiff's complaint caused Defendant to engage in actions that disadvantaged him. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (finding that there can be no retaliation claim where a plaintiff's "situation in the wake of h[im] having made the complaint is the same as it would have been had []he not brought the complaint").

Because Plaintiff has failed to show that he suffered an adverse employment action, the Court must grant summary judgment on his retaliation claims under the ADA and CFEPA.

## IV.   **CONCLUSION**

For the foregoing reasons, Wallingford's Motion for Summary Judgment (ECF No. 35) is **GRANTED**. Judgment is entered in the defendant's favor. As there are no remaining claims, the Clerk is directed to close this case.

**SO ORDERED.**

Hartford, Connecticut
July 30, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

---

[6] As a reminder, Plaintiff maintained all of his benefits throughout the 2020–21 school year, did not have to use any sick leave from November 2020 to the end of the school year, and was granted a request made in March 2021 to transfer schools in June 2021.